Matthew J. Langley
SBN 342846
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, Illinois, 60614
Tel.: (773) 554-9354
matt@almeidalawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| **DAVID RAMIREZ,** *on behalf of himself and all others similarly situated*, <br><br> Plaintiff, <br><br> vs. <br><br> **EVERYDAY HEALTH, INC.** <br><br> Defendant. | Case No.: 2:25-cv-10137 <br><br> **CLASS ACTION COMPLAINT** <br><br> 1. INVASION OF PRIVACY; <br> 2. VIOLATION OF CAL. CONST. ART. 1 §1; <br> 3. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631(a); <br> 4. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 638.51(a). <br> 5. NEGLIGENCE; <br> 6. UNJUST ENRICHMENT; <br> 7. VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. SECTION 2511(1), et seq.; <br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff David Ramirez ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Everyday Health, Inc. ("Everyday Health" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents as to all other matters:

## INTRODUCTION

1. Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.

2. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

3. The need for data privacy, security and transparency is particularly acute when it comes to the rapidly expanding world of digital telehealth providers; of all the information the average internet user shares with technology companies, health data is some of the most extensive, valuable and controversial.

4.      An organization's unauthorized disclosure of an individual's personal health information can have devastating consequences to the individual, including employment discrimination, insurance denials, social stigmatization, damaged relationships, and professional licensing issues. If people cannot trust that information related to their personal health will remain private, they may avoid seeking treatment information and care, leading to untreated health issues.

5.      Everyday Health operates one of the internet's most-visited physical and mental health information websites, https://www.everydayhealth.com (the "Website").[1] The Website provides health content that allows its users to "make informed decisions that support the health and well-being of yourself" including "managing care with your doctor to making everyday self-care and wellness choices."[2]

6.      Through the Website, Everyday Health provides users the ability to research their own physical and mental health conditions as well as to search, by specific practice area, doctors, therapists, and other health professionals who treat those conditions and to book in-person appointments with those health care professionals.

7.      Unfortunately, unbeknownst to Plaintiff and other users to Everyday Health's Website, their private personal and health information was not actually being kept private. Instead, through its Website, Everyday Health collected and transmitted personally identifiable information ("PII")

---

[1] Defendant also operates a suite of smartphone apps and services that perform similar or complimentary services to those offered on the Website (the "Digital Properties").

[2] *See* https://www.everydayhealth.com/about-us/

as well, Personal Health Information ("PHI," collectively, "Sensitive Health Information") pertaining to Plaintiff and other Everyday Health customers. The PHI of Website users disclosed by Everyday Health to unauthorized third parties, including Alphabet, Inc. ("Google"), through the use of surreptitious online tracking tools included: the doctors they searched for, the medical condition those doctors treat, the fact that they made an appointment with those doctors, and the specific medical services for which they booked appointments.[3]

8. Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used as fuel for a massive, targeted advertising enterprise.

9. Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is concerned a persons PHI, it will collect that information and allow its clients to use that information to stream ads related to personal health services to that person's computers and smartphones.

10. Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements,

---

[3] Other tracking technology installed on the Website includes trackers for Amazon and Magnite.

performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

11. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

12. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website users' privacy.

13. Everyday Health is one of the companies that have chosen to prioritize its marketing efforts and profits over its customers privacy by installing Google's Tracking Tools on its websites.

14. Plaintiff and Class Members (defined below) used the Website and had their Sensitive Health Information disclosed by Defendant through the Tracking Tools. However, Defendant *never* obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Health

4

Information to be transmitted to the third parties, including the largest advertiser and compiler of user information, Google.

15. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: invasion of medical privacy; lack of trust in communicating with medical providers; emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties; loss of benefit of the bargain; diminution of value of the Sensitive Health Information; statutory damages; and continued and ongoing risk to their Sensitive Health Information.

16. Therefore, to remedy these harms, Plaintiff asserts the following statutory and common law claims against Defendant on behalf of himself and Class Members: (i) Invasion of Privacy; (ii) invasion of privacy under the California Constitution; (iii) violations of the California Invasion of Privacy Act, Cal. Pen. Code § 631(a); and (iv) violations of the California Invasion of Privacy Act, Cal. Pen. Code § 638.51(a) (v) Negligence; (vi) Unjust Enrichment; (vii) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.

**PARTIES**

***Plaintiff David Ramirez***

17. Plaintiff is a citizen of the State of California, residing in Los Angeles County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

18. In or around February of 2025, Plaintiff accessed the Website on his personal electronic devices to make an appointment for health services, through which he disclosed to Everyday Health his Sensitive Health Information, including the specific mental health symptoms that he was

experiencing and other medical information requested by Everyday Health pertaining to his health.  Plaintiff also searched for and selected the specific doctor with which he made an appointment, the specific location of that appointment, and searched for other additional information regarding his physical health conditions.

19.    Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that he communicated while using the Website, including his specific medical conditions, the services he sought to treat those conditions, the fact that he made an appointment to treat those conditions, the doctor with whom he made that appointment, the practice area of that doctor, and the location of the appointment and the doctor.

20.    Plaintiff never authorized Everyday Health to disclose any aspect of his communications through the Website to third parties, including the Sensitive Health Information that he provided through the Website.

21.    On every occasion that he visited the Website, Plaintiff possessed an account with Google, and he accessed the Website while logged into his Google account on the same device.

22.    After providing his Sensitive Health Information to Defendant through the Website, Plaintiff began seeing targeted online advertisements for health-related services.

***Defendant Everyday Health***

23.    Defendant Everyday Health, Inc. is a for-profit corporation organized under the laws of Delaware with its principal place of business at 360 Park Avenue South, 17th Floor, New York, New York 10010.

**JURISDICTION AND VENUE**

24.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

25.    This Court has specific personal jurisdiction over Defendant Everyday Health because it has availed itself of the rights and benefits of the State of California, including by (1) providing services in this District; (2) conducting substantial business in this District, including, but not limited to, business with Plaintiff, and (3), perpetuating unlawful acts in this District.

26.    Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because: a substantial part of the events giving rise to this action occurred in this District, including because Defendant collects and redistributes Class Members' Sensitive Health Information in this District; and Defendant caused harm to Class Members residing in this District.

27.    This action is properly filed in the Western Division of the Central District of California pursuant to Local Rule 3-2.3 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Los Angeles County.

## FACTUAL ALLEGATIONS

**A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES.**

**a. Google's Mass Advertising Surveillance Operation.**

28.   Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

29.   Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But, in order for website operators to get information from Google Analytics about their

---

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 7, 2025).

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Oct. 7, 2025).

[6]   *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 7, 2025).

website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

30.   Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

31.   Google also admits that it uses the information collected from third party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

32.   While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant were part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been

---

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Oct. 7, 2025).

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Oct. 7, 2025).

[9] *Id*.

9

reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

33.    Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[10] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[11]

34.    Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[12] and Google trackers are present on 74-percent of all web traffic.

---

[10] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[11] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Oct. 7, 2025).

[12] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 7, 2025).

35. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[13]

b. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[14] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[15]

c. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[16] In

---

[13] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[14] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Oct. 7, 2025).

[15] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Oct. 7, 2025).

[16] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

11

fact, Google advertising trackers were found on 73-percent of pornography websites.[17]

36. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[18]

37. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[19]

38. When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages

---

[17] *Id.*

[18] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Oct. 7, 2025).

[19] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Oct. 7, 2025) ("Google Analytics gives you the tools, free of charge"),

demographic data collected by Google to provide detailed analyses of the website's user base.[20]

39.    Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[21] And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[22]

40.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[23]

**b.  Pixels Can Record Almost Every Interaction Between a User and a Website.**

41.    In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto the Website.

---

[20]    *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Oct. 7, 2025).

[21] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[22] *Id*.

[23] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

13

42.   Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews . . . . Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[24]

43.   Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[25]

---

[24] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Oct. 7, 2025).

[25] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Oct. 7, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Oct. 7, 2025).

44. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[26]

**c. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google.**

45. Every website is hosted by a computer "server" that holds the website's contents.

46. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

47. Electronic communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and

[26] *Lurking Beneath the Surface, supra* note 24.

15

Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

48.    Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[27] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[28] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[29]

49.    When a Google user logs onto their account, their web browser records a Google tracking cookie.[30] This cookie includes a specific line of code that links the web browser to the user's Google account.[31]

50.    Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device,

---

[27]  *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Mar. 7, 2025).

[28] *Id*.

[29] *Id*.

[30] Cyphers, *supra* note 10.

[31] *Id*.

type of browser, and IP address), all relayed contemporaneously as the website user navigates the website.

51.    In this way, the Google Pixels are each a "process" because they are "software that identifies consumers, gathers data, and correlates that data."

52.    The Google Pixels are also each a "device" because "in order for software to work, it must be run on some kind of computing device."

53.    Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

54.    The Pixels then combine the data received from the browser with the data acquired from the cookie, and instruct the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

55.    A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[32] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any

---

[32] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Oct. 7, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 7, 2025).

17

information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

56. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

57. Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

58. The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132). Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains geographical location. Through an IP address, the device's state, city, and zip code can be determined.

59. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[33] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[34] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint

[33] Cyphers, *supra* note 10.

[34] *Id*.

18

becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### d. Defendant Disclosed Plaintiff's and Class Members' Sensitive Health Information to Google.

60. Plaintiff and Class Members used Everyday Health's Website to research health conditions and book appointments with doctors and therapists.

61. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google.

62. The following screenshot ("Figure 1") depicts the network transmissions made by the Tracking Tools that Defendant installed on the Website when Website customers select "Book Appointment" to begin the process of booking an appointment with a specific doctor. The information provided in Figure 1 is exemplar information collected on the Website, and is not Plaintiff's information, but the Tracking Tools installed on the Website collected the same or similar information about Plaintiff.

*Figure 1: Screenshot depicting back-end network traffic from the Website which show information transmitted to Google when Website users schedule an appointment.*

URL: https://www.google-analytics.com/g/collect?v=2&tid=G-5BGF60ENGN&gtm=45je5a11v9186
825297z8845970599za200zb845970599zd845970599&_p=1759518957452&gcs=G111&gcd
=13v3v3v3v6l1&npa=0&dma=0&cid=1387582212.1754583866&ul=en-us&sr=1920x1080&frm=
0&pscdl=noapi&_eu=AAAAAAQ&_s=3&tag_exp=101509157~103116026~103200004~1032334
27~104527907~104528501~104684208~104684211~104948813~115480710~115834636~115
834638~115868795~115868797&sid=1759518500&sct=8&seg=1&dl=https%3A%2F%2Fwww.
everydayhealth.care%2Fproviders%2F278654%2Fnikhil-j-shastri-md%2F&dt=Dr.%20Nikhil%2
0Shastri%2C%20MD%20%7C%20Gastroenterologist%20in%20Des%20Plaines%2C%20IL&_tu
=AAg&en=click&_c=1&ep.click_text=book%20appointment&epn.doctor_id=1871671271&epn.en
hanced=1&epn.featured=1&ep.zipcode=60016&ep.category=Gastroenterologist&ep.template=d
octor-profile&ep.link_url=https%3A%2F%2Fwww.everydayhealth.care%2Fproviders%2F27865
4%2Fnikhil-j-shastri-md%2F%23booking&epn.top_doctor=1&epn.top_hospital=1&ep.hospital_
name=Ascension%20Saint%20Alexius%20(Hoffman%20Estates%2C%20IL)&ep.hospital_zip=6
0194&ep.hospital_state=IL&_et=153&tfd=672843

63. As Figure 1 shows, when patients select the "Book Appointment" button on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website include the name of the doctor whose services the user is seeking, the type of service sought ("gastroenterology" in the screenshot above), the hospital where the user has booked an appointment, and that hospital's city and state.

64. This screenshot also shows that the Google Pixel on the Website transmitted the identifier numbers attached to Google's 'cid' and 'gdid' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, web browser software and version number, and operating system and version number. The information that was transmitted to Google therefore linked the Sensitive Health Information provided by Plaintiff to his identity.

20

65. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as the URLs visited by internet users.[35] Defendant purposely configured the Google Pixels on the Website to collect and transmit additional user data, including the health information provided by patients through its Book Appointment pages and the specific doctor from whom they sought treatment.

**B. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT.**

**a. Defendant Failed to Inform Plaintiff and Class Members of its Disclosure of Plaintiff's and Class Members' Sensitive Health Information.**

66. Defendant violated Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant never provided actual or constructive notice to Plaintiff that it was sharing his Sensitive Health Information with third parties, including Google.

67. By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant violated Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

---

[35] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 25, 2025).

21

68.    Defendant impermissibly allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

**b.    The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members**

69.    The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Website.

70.    Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

71.    Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

72.    Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

**a.    Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.**

73.   As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its website.

74.   Upon information and belief, Defendant, as users of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Health Information.

**b.    Plaintiff's and Class Members' Data Had Financial Value.**

75.   Moreover, Plaintiff's and Class Members' Sensitive Health Information has value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

76.   According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[36]

---

[36] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

77. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

78. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[37] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[38]

79. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

80. The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiff and Class Members.

**D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.**

81. The disclosure of Plaintiff's and Class Members' Private

---

[37] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[38] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[39]

82. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[40]

83. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

---

[39] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last accessed Oct. 7, 2025).

[40] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

84. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply *not* permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

85. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

86. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

87. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying

26

number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

88. The HIPAA Privacy Rule requires any "covered entity"—which includes proprietors of medical services like Everyday Health—to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

89. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[41]

90. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply

---

[41] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 7, 2025).

put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[42]

91. Here, Defendant provided protected health information to third parties in violation of the Privacy Rule.

92. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

93. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

    b.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

    c.    Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known

---

[42] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 7, 2025).

to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e.   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f.   Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g.   Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

94. In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain

29

clinic, then this information would be PHI.[43]

95.   In its Guidance regarding Marketing, HHS further instructed in 2003:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.* (Emphasis added).[44]

96.   HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

a.   "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.   "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing

---

[43] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[44]*Marketing_____*,   HHS, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf  (April 3, 2003) (last visited Mar. 7, 2025).

30

communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

97. In other words, HHS has expressly stated that Defendant have violated HIPAA Rules by implementing the Tracking Technologies. Courts, including in this District, have found the same under near-identical circumstances.[45]

## E. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.

98. At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

99. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

---

[45] *See, e.g., Gaige v. Exer Holding Co., LLC*, No. 2:24-cv-06099-AH-(AJRx), 2025 U.S. Dist. LEXIS 17146, *12 (C.D. Cal. Jan. 30, 2025); *A.D. v. Aspen Dental Mgmt., Inc*., No. 24 C 1404, 2024 U.S. Dist. LEXIS 161090, at *2-10 (N.D. Ill. Sep. 9, 2024); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023).

100. For example, a recent Consumer Reports study shows that 92 percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[46]

101. Moreover, Americans are particularly interested in the safety of their health information. Over 50 percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[47] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80 percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[48]

102. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

---

[46] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

[47] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[48] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

## TOLLING AND ESTOPPEL

103. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

104. The Tracking Tools on the Website were and are invisible to the average website visitor.

105. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

106. Plaintiff was not aware of the information essential to pursue his claims, without any fault or lack of diligence on his part.

107. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiff and Class Members, that by scheduling appointments through the Website, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

108. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

109. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

110. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## CLASS ALLEGATIONS

111. This action is brought by the named Plaintiff on his behalf and on behalf of a proposed Class of all other persons similarly situated (the "Class Members"), under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

112. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

113. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate California Subclass, which is defined as follows:

**California Subclass**

All natural persons residing in the State of California who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

114. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

34

115. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

116. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

117. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)    Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b)    Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c)    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d)    Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health

Information was being disclosed without their consent;

e)      Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f)      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g)      Whether Defendant violated the statutes asserted as claims in this Complaint;

h)      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i)      Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy practices; and

j)      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

118. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

119. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

120. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

121. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents

far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

122. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

123. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

124. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## <u>COUNT I</u>
## <u>COMMON LAW INVASION OF PRIVACY</u>
### <u>*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)*</u>

125. Plaintiff repeats and realleges the allegations contained in preceding paragraphs as if fully set forth herein.

126. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

127. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

128. Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they

understood Defendant would keep private and secure.

129. Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

130. Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

131. Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

132. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

133. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

134. Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

135. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

40

136. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT II**
**INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION**
**Cal. Const. Art. 1, § 1**
***(On Behalf of Plaintiff and the California Subclass)***

4. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein

5. Article I, section 1 of the California Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

6. The right to privacy in California's constitution creates a private right of action against private and government entities.

7. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy, and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

8. Defendant violated Plaintiff's and California Subclass Members' constitutional right to privacy by collecting, storing and disclosing their personal information in which they had a legally protected privacy interest and for which they had a reasonable expectation of privacy, in a manner that was highly offensive to Plaintiff and California Subclass Members and was an egregious violation of social norms.

9. Defendant has intruded upon Plaintiff's, and California Subclass

41

Members' legally protected privacy interests, including interests in precluding the dissemination or misuse of their confidential Personal Information.

10. Plaintiff and California Subclass Members had a reasonable expectation of privacy in that: (i) Defendant's invasion of privacy occurred as a result of Defendant's security practices, including the collecting, storage, and unauthorized disclosure of consumers' Sensitive Information; (ii) Plaintiff and California Subclass Members did not consent to or otherwise authorize Defendant to disclose their Sensitive Information; and (iii) Plaintiff and California Subclass Members could not reasonably expect Defendant would commit acts in violation of privacy protection laws.

11. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and California Subclass Members have been damaged and have suffered actual and concrete injuries.

12. Plaintiff and California Subclass Members are entitled to appropriate relief, including damages to compensate them for the harm to their privacy interests, loss of valuable rights and protections, heightened stress, fear, anxiety, risk of future invasions of privacy and the mental and emotional distress and harm to human dignity interests caused by Defendant's invasions.

13. Plaintiff and California Subclass Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably Plaintiff and Subclass Members for the harm to their privacy interests, nominal damages, and/or disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class Members' privacy.

42

## COUNT III
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"), Cal. Pen. Code § 360, *et seq.*
### (Violations of Section 631(a))
### (*On Behalf of Plaintiff and the California Subclass*)

14. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

15. The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

16. Under CIPA, it is unlawful to:

1. "[W]illfully and *without the consent of all parties to the communication*, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

2. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

3. [A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

43

17.   At all relevant times, Defendant aided, employed, agreed with, and conspired with Google, and likely other third parties, to track and intercept Plaintiff and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop on and intercept in real-time the content of intercept Plaintiff and California Subclass Members' private communications with Defendant.

18.   The content of those conversations included Sensitive Health Information. Through Defendant's installation and configuration of the Tracking Tools on the Website, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

19.   Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and California Subclass Members, transmitted the substance of their confidential communications with Defendant to third parties.

20.   Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff and California Subclass Members' Sensitive Health Information by embedding the Tracking Tools on the Website, thereby assisting Google's eavesdropping

21.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools falls under the broad catch-all category of "any other manner":

1. The computer codes and programs Google and other third parties used to track intercept Plaintiff's and California Subclass

44

Members' communications while they were navigating the Website;

2. Plaintiff's and California Subclass Members' internet browsers;

3. Plaintiff's and California Subclass Members' computing and mobile devices;

4. Google's web and ad servers;

5. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff 's and California Subclass Members' communications while they were using a web browser to access or navigate the Website; and

6. The computer codes and programs used by Google and other third parties to effectuate their tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a browser to visit the Website.

22. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties, including Google and its agents, employees, and contractors to receive Plaintiff's and California Subclass Members' Sensitive Health Information in real time through the Website without their consent

23. By disclosing Plaintiff's and California Subclass Members' Sensitive information, Defendant violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

24. As a result of Defendant's violation of the CIPA, Plaintiff and California Subclass Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages,

45

attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## COUNT IV
## VIOLATIONS OF CIPA, Cal. Pen. Code § 360, *et seq.*
### (Violations of Section 638.51(a))
### (*On Behalf of Plaintiff and the California Subclass*)

25.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

26.   CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap device without first obtaining a court order."

27.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b).

28.   The Tracking Tools are "pen registers" because they are "device[s] or process[es]" that capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class Members' computers or smartphones. Cal. Pen. Code § 638.50(b).

29.   At all relevant times, Defendant installed the Tracking Tools—which are pen registers—on Plaintiff's and Class Members' browsers and used the Tracking Tools to collect Plaintiff's and Class Members' IP addresses.

30.   Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Tracking Tools.

46

31.    Defendant did not obtain a court order to install or use the Tracking Tools.

32.    Pursuant to California Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT V
## NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)

33.    Plaintiff repeats and realleges the allegations contained in preceding paragraphs as if fully set forth herein.

34.    Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

35.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

36.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

37.    Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

38.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to

47

Defendant had they known that Defendant intended to use that information for unlawful purposes.

39. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

40. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

41. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT VI
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)*

42. Plaintiff repeats and realleges the allegations contained in preceding paragraphs as if fully set forth herein.

43. Plaintiff pleads this claim in the alternative to their breach of implied contract claim.

44. Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

48

45. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

46. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

47. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

48. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

49. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

50. Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

51. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

52. Defendant should be compelled to disgorge into a common fund

or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## COUNT VII
## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*
### Unauthorized Interception, Use, and Disclosure
### *(On Behalf of Plaintiff and the Nationwide Class)*

53. Plaintiff repeats and realleges the allegations contained in preceding paragraphs as if fully set forth herein.

54. The ECPA protects both sending and receipt of communications.

55. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

56. The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

57. Electronic Communications. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

58. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

50

59. <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

60. <u>Electronic, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

61. By utilizing and embedding the Pixels on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

62. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Google.

63. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including the reasons for their

51

appointment, the dates of their appointment, and the location of their appointment.

64. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

65. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

66. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

67. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

68. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of

52

Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

69.    Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a.    Invasion of privacy;

b.    Breach of confidence;

c.    Breach of fiduciary duty;

d.    Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

e.    Violations of the California Invasion of Privacy Act, Cal. Pen. Code. § 630., *et seq.*

70.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

71.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with Google and other third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

72. As such, Defendant cannot viably claim any exception to ECPA liability.

73. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d. Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain

private, no longer private.

74. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

75. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

76. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

77. Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

78. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

79. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and other Class Members, prays for judgment against Defendant as follows:

A.     an Order certifying the Nationwide Class and appointing

55

the Plaintiff and their Counsel to represent the Classes;

B.   equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C.   injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.   an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.   an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.   prejudgment interest on all amounts awarded and

G.   all such other and further relief as this Court may deem just and proper.

Dated: October 22, 2025                     Respectfully submitted,

                                            */s/ Matthew J. Langley*
                                            Matthew J. Langley
                                            SBN 342846
                                            **ALMEIDA LAW GROUP LLC**
                                            849 W. Webster Ave.
                                            Chicago, Illinois, 60614
                                            Tel.: (773) 554-9354
                                            matt@almeidalawgroup.com

56

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of himself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: October 22, 2025          Respectfully submitted,


                                 <u>*/s/ Matthew J. Langley*</u>

                                 Matthew J. Langley